## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RALPH R. STOGNER, III**                          **CIVIL ACTION**

**versus**                                          **NO. 05-4317**

**N. BURL CAIN, WARDEN, ET AL.**                    **SECTION: "K" (3)**


## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Ralph R. Stogner, III, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On October 17, 2001, he was convicted of first degree murder and aggravated rape in violation of La.Rev.Stat.Ann. §§ 14:30 and 42.[2]  On January 4, 2002, he was sentenced on each conviction to a term life imprisonment without benefit of parole, and it was ordered that the sentences run concurrently.[3]  On June 27, 2003, the Louisiana First Circuit Court of Appeal affirmed his convictions and sentences.[4]  He then filed with the Louisiana Supreme Court related writ applications which were denied on January 30, 2004.[5]

On March 5, 2004, petitioner filed with the state district court an application for post-conviction relief.[6]  That application was denied on April 19, 2004.[7]  He next filed with the Louisiana First Circuit Court of Appeal an application for supervisory writs which was denied on September

---

[2] State Rec., Vol. XXV of XXVIII, transcript of October 17, 2001, p. 127; State Rec., Vol. I of XXVIII, minute entry dated October 17, 2001; State Rec., Vol. III of XXVIII, jury verdict form.

[3] State Rec., Vol. XXVI of XXVIII, transcript of January 4, 2002, p. 10; State Rec., Vol. I of XXVIII, minute entry dated January 4, 2002.

[4] State v. Stogner, No. 2002-KA-1884 (La. App. 1st Cir. June 27, 2003) (unpublished); State Rec., Vol. XXVII of XXVIII.

[5] State v. Stogner, 865 So.2d 73 (La. 2004) (No. 2003-K-2151); State v. Stogner, 865 So.2d 76 (La. 2004) (No. 2003-KO-2239); State Rec., Vol. XVII of XXVIII.

[6] State Rec., Vol. XXVII of XXVIII.

[7] State Rec., Vol. XXVII of XXVIII, Order dated April 19, 2004.

7, 2004.[8]  He then filed with the Louisiana Supreme Court an application for supervisory and/or remedial writs which was denied on June 24, 2005.[9]

On September 21, 2005, petitioner filed this federal application for *habeas corpus* relief.[10]  In support of his application, petitioner claims:

1.      The state courts erred in failing to quash the indictment;

2.      The trial court erred in allowing the introduction of highly unreliable, unscientific, and invalid evidence;

3.      Petitioner received ineffective assistance of counsel; and

4.      The state withheld exculpatory and impeachment evidence.[11]

The state concedes that petitioner's federal application is timely filed and that he exhausted his state court remedies.[12]  Accordingly, this Court will address the merits of petitioner's claims.

---

[8] State *ex rel.* Stogner v. State, No. 2004-KW-1144 (La. App. 1st Cir. Sept. 7, 2004) (unpublished); State Rec., Vol. XXVII of XXVIII.

[9] State *ex rel.* Stogner v. State, 904 So.2d 736 (La. 2005) (No. 2004-KH-2560); State Rec., Vol. XXVII of XXVIII.

[10] Rec. Doc. 4.

[11] The seven overlapping claims in petitioner's federal application have been consolidated for ease of analysis.

[12] Rec. Doc. 13, pp. 2 and 6-7.

<u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.   The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams[ v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002) (citations omitted).

<u>Facts</u>

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts

of this case as follows:

> The eleven-year-old victim, referred to herein as "L.E.," lived in Slidell with her mother, her mother's boyfriend, Chris Cue, and Cue's three-year-old son.  On April 15, 1998, during Easter vacation, the victim was abducted from her home, raped vaginally and anally, beaten, and murdered.  Her body was dumped in an industrial area near Jourdan Road in New Orleans, where it was later found on April 17.

> The victim's mother was expected to be at her place of employment at ten o'clock the morning of April 15, 1998.  Cue had left much earlier that morning to go to his construction job.  At approximately five minutes before ten o'clock, the victim's mother reluctantly left the two children home alone.  She evidently expected Cue to return home shortly thereafter.  She left L.E. in charge of the little boy and last saw them playing in front of the house.  Because Cue could not leave his job as early as he had expected, he telephoned home.  He was surprised when his son answered the telephone.  Concerned, he asked a co-worker to stop by his house to check on the children.  The co-worker arrived at Cue's home sometime before noon.  L.E. was not there when he arrived, and Cue's son was playing on the front porch with a toy truck.  Cue arrived home soon thereafter.  He was upset because he believed L.E. had intentionally left his son home alone.

> Shortly after three o'clock that afternoon, the victim's mother returned home from her place of employment.  She became very concerned to find that L.E. was not there.  She began to call relatives to see if anyone had seen the young girl that day.  By approximately five o'clock that evening, she called the police.

> A neighbor, Scott Huff, was home from college for Easter vacation.  Huff lived on a different street from L.E.'s family, but nearby.  He saw police officers in front of L.E.'s house and learned that L.E. was missing.  He remembered earlier that day, between ten o'clock and ten thirty in the morning, he had spoken to a man who had stopped in front of his house to ask for directions.  The man was driving a red S-10 Chevrolet truck.  The man was delivering luggage for Choice Courier, a company that provides for the delivery of luggage that is late or temporarily lost by airlines.  He asked Huff for

directions to Poplar Street.  Huff told him he would have to pass Gayoso Street, the street on which the victim lived.  Huff described this man to police officers as a six-foot tall Caucasian man, weighing about 240 pounds, with grayish-brownish hair.  He told officers that the man was wearing blue jeans, a flannel shirt, and "light-skinned, brown-skinned tan cowboy boots."

Further investigation revealed that the deliveryman was Ralph R. Stogner, III.  The manifest from the courier service reflected that Stogner made the delivery to Jerry Seig on Poplar Street at five minutes after ten o'clock.

On April 16, 1998, F.B.I. agents, the sheriff, and police officers arrived at defendant's home in Arabi, Louisiana.  They telephoned anonymously ahead in order to confirm that he was home. When they knocked on his door, he did not answer for some time. When he finally came to the door, he appeared nervous and was extremely cooperative.  The police told him they were looking for a young girl who was missing from her home, and they asked if they could search his house.  He consented to their search.  After approximately twelve hours, when defendant saw that the officers intended to search his truck, he revoked his consent.  The officers then obtained a search warrant.

The investigators found a flannel shirt and boots matching the description given by Huff in defendant's house.  They found twelve hairs, one on defendant's boot.  According to Robert Fram, an F.B.I. agent who testified at defendant's trial, the twelve hairs found in defendant's house had been dyed more than once, in a non-professional manner.  The victim's mother testified that she had dyed the victim's hair.  Fram testified that pursuant to analysis, these hairs could not be excluded as the victim's hair.  Dr. John Stewart, who testified for the State and was qualified by the court as an expert in the field of DNA analysis, testified that the genetic profile of the hair taken from defendant's boot matched the genetic profile of the victim's hair.  Additionally, the hair that had been taken from defendant's trash can reflected the same mitochondrial DNA profile as that of the victim's hair.  Dr. Stewart concluded that the victim could not be eliminated as the source of the hair.

Officers obtained a search warrant to search defendant's truck.  The truck was extremely clean.  Black carpet fibers taken from the defendant's truck floor exhibited the same microscopic characteristics as fibers taken from the victim's t-shirt.  Additionally, a certain brand of lipstick was found in the back of the truck.  The

victim's grandmother testified at trial that she had recently bought this brand of lipstick for the victim.

A forensic pathologist with the Orleans Parish Coroner's Office, who performed the autopsy of the victim's body, testified at trial that the victim died of strangulation. He observed substantial bruising on various parts of the victim's body, as well as vaginal and anal tears, indicating that she had been beaten and raped, vaginally and anally. Debris taken from the victim's head hair combings, her underpants, and her t-shirt reflected the same microscopic characteristics as towel fibers taken from towels found in defendant's bathroom. Most significantly, a vaginal swab taken from the victim showed that semen was present. The semen was sent to a lab for typing using STR DNA analysis. According to the results of this testing, the semen from the vaginal swab matched, to a reasonable degree of scientific certainty, defendant's DNA. Brendan Shea, an FBI forensic examiner, who was qualified by the court as an expert in the field of forensic serology and DNA analysis, testified that there is only a one- in one-hundred thirty trillion chance that someone else in the Caucasian population would have the same genetic information.[13]

<u>Grand Jury Claim</u>

Plaintiff, a white male, was indicted by a grand jury whose foreperson was a white female. He claims that his indictment should have been quashed because the foreperson was selected in a discriminatory manner. Pursuant to <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), petitioner clearly has standing to assert such a claim.[14] However, regarding such discrimination claims, the United States Fifth Circuit Court of Appeals has held:

---

[13] <u>State v. Stogner</u>, No. 2002-KA-1884, at pp. 4-7 (La. App. 1st Cir. June 27, 2003) (unpublished); State Rec., Vol. XXVII of XXVIII.

[14] In <u>Campbell</u>, the United States Supreme Court held that a white criminal defendant has the requisite standing to raise equal protection and due process claims objecting to discrimination against black persons in the selection of grand jurors. 523 U.S. at 394.

A constitutional basis for relief from discrimination is not proved merely by suspicion or loud outcry. The prerequisites for federal relief from the allegedly discriminatory selection of a grand jury were established in Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The petitioner must: (1) establish that the group against whom discrimination is asserted is a recognizable, distinct class, singled out for different treatment; (2) prove the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve, here as foremen, over a significant period of time; and (3) support the presumption thus created by showing that the selection procedure is susceptible to abuse or is not racially neutral. Id. at 494, 97 S.Ct. at 1280, 51 L.Ed.2d at 510, cited with approval, Rose v. Mitchell, 443 U.S. at 563, 99 S.Ct. at 3005, 61 L.Ed.2d at 754. See United States ex rel. Barksdale v. Blackburn, 639 F.2d 1115, 1121-1123 (5th Cir. 1981) (en banc). Once these prerequisites have been proved, a prima facie case has been established and the burden shifts to the state to rebut that showing.

Guice v. Fortenberry, 661 F.2d 496, 499-500 (5th Cir. 1981). In the instant case, petitioner's claim was rejected by the state courts due to his failure to establish a *prima facie* case of discrimination.

On September 28, 2001, petitioner's counsel filed a motion to quash the indictment.[15] The Court addressed that motion on October 8, 2001. The transcript reflects the following:

BY MR. MCNARY [defense counsel]:

---

[15] State Rec., Vol. III of XXVIII. Petitioner, through inmate counsel, had previously filed a similar motion. State Rec., Vol. II of XXVIII. However, with respect to that motion, the record reflects:

A **Motion to Quash Grand Jury Indictment**, has been filed by Inmate Rodney Revere on behalf of the defendant herein. The defendant has reviewed said motion and Counsel for the Defense have reviewed said motion and feel the motion "should be ignored" and finds it has "no merit". Court finds that Inmate Rodney Revere had no authority to file the motion on defendant's behalf.

State Rec., Vol. I of XXVIII, minute entry dated July 12, 2001; see also State Rec., Vol. X of XXVIII, transcript of July 12, 2001, pp. 237-38.

Your Honor, we had previously filed a motion to quash the indictment.  I submitted a memorandum along with that.  And I would submit it on the memorandum.  There's no evidence to put on.

BY THE COURT:
Does the State wish to address that motion in any way?

BY MR. DEARING [the prosecutor]:
Your Honor, the State would submit on the record.  I believe that this court has, in fact, addressed this issue in other cases before.

BY THE COURT:
I have.  And I find that there's insufficient evidence for the motion.  The court has ruled on these types of motions on several occasions.  The decisions have gone all the way to the State Supreme Court.  And no one, yet, no court yet, has found that there was, there are any problems with our selection of the grand jury.[16]

When petitioner again raised the issue on direct appeal, the Louisiana First Circuit

Court of Appeal rejected the claim, holding:

Defendant asserts the foreperson of the grand jury that charged him by indictment in the instant matter was selected in a manner that violated defendant's due process rights.  The foreperson in the instant matter, a white woman, was selected by the trial judge rather than by a random drawing from among the grand jurors.  Louisiana Code of Criminal Procedure article 413 B was amended by 1999 La. Acts No. 984, § 1 to provide that the foreperson shall be selected randomly from the impaneled grand jury.  In the instant matter, the October 1, 1998 bill of indictment precedes this change in the law.  Consequently, the selection process utilized in the instant matter was not in violation of Article 413 B as it existed prior to the 1999 amendment.
Defendant has standing to raise this claim, but has the burden of proving the systematic exclusion over time of African-Americans as grand jury forepersons.  See **State v. Kennedy**, 02-214, pp. 7-15 (La. App. 5 Cir. 6/26/02), 823 So.2d 411, 415-420, underline writ denied, 2002-2088 (La. 1/24/03), 836 So.2d 43.

---

[16]  State Rec., Vol. XIX of XXVIII, transcript of October 8, 2001, pp. 3-4.

> Defendant filed a motion to quash the grand jury indictment, asserting racial and gender discrimination in the foreperson selection process, pursuant to La. Code Crim. P. art. 533 (1). He failed, however, to present information in support of his motion, nor did he present evidence in a hearing to demonstrate that the selection process in effect at the time violated constitutional due process and equal protection requirements by systematically excluding African-Americans from serving as grand jury forepersons in St. Tammany Parish. While a request for a hearing was included within defendant's motion to quash, his counsel submitted the motion to be decided without a hearing. Defendant's counsel stated he had no evidence to present in support of the motion. Consequently, defendant has failed to present any evidence of systematic discrimination in the selection process. Defendant has failed to meet his burden of proof. Accordingly, we find that this assignment of error is without merit.[17]

In its response in this proceeding, the state argues that petitioner's claim must be rejected because he has never brought forth any evidence of systematic discrimination in the selection of grand jury forepersons in St. Tammany Parish during the decade preceding his indictment in 1998.[18] In his "traverse," petitioner concedes that he has never presented such evidence; however, he requests that this Court now assist him in securing such evidence and then hold an evidentiary hearing addressing the merits of his claim.[19]

Having failed to diligently pursue his claim in state court, petitioner is not entitled to now attempt to gather his evidence and prove his claim in the first instance in this Court. Federal law provides:

---

[17] State v. Stogner, No. 2002-KA-1884, at pp. 20-21; State Rec., Vol. XXVII of XXVIII.

[18] Rec. Doc. 13, pp. 8-9.

[19] Rec. Doc. 14, pp. 2-4.

> If the applicant has failed to develop the factual basis for his claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>> (A) the claim relies on–
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Interpreting that provision, the United States Supreme Court has noted:

> Section 2254(e)(2) begins with a conditional clause, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings," which directs attention to the prisoner's efforts in state court.  We ask first whether the factual basis was indeed developed in state court, a question susceptible, in the normal course, of a simple yes or no answer.

Williams v. Taylor, 529 U.S. 420, 431 (2000).  If the answer is no, then the pertinent issue is whether the failure to develop the factual basis of the claim was the fault of the petitioner.  A petitioner is considered to be at fault when he or his counsel, through simple lack of diligence or some greater fault, fails to take the necessary steps in state court to develop the factual basis of his claim.  Id. at 432.

In summary, as the Supreme Court noted:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court,

> unless the statute's other stringent requirements are met.  Federal courts sitting in habeas are not an alternative forum for trying facts and issues when a prisoner made insufficient effort to pursue in state proceedings.

Williams, 529 U.S. at 437.

In the instant case, petitioner seeks to excuse his failure by complaining that the statistical evidence needed to support his claim was in the state's possession.[20]  However, he has not established that the state withheld that evidence from him.  Moreover, there is no reason to believe that he or his counsel could not have requested that evidence from the state and, *if refused*, had the state court compel its production, much as he now requests this Court to do.  As a result, he has not demonstrated that he was diligent in developing the record in the state district court and giving that court the opportunity to consider the merits of his claim.  Therefore, any fault in failing to develop this claim in state court rests squarely with petitioner.  In light of that fact, and because he has not demonstrated that the exceptions set forth in 28 U.S.C. § 2254(e)(2) apply, he is not entitled to an evidentiary hearing in federal court on his claim.  Riddle v. Cockrell, 288 F.3d 713, 719 (5th Cir. 2002); Smith v. Dretke, 134 Fed. App'x 674, 681 (5th Cir.), cert. denied, 126 S.Ct. 805 (2005).

Because petitioner clearly failed to meet his burden of proof with respect to this claim in state court, and because he is barred from attempting to now do so in this Court, his claim challenging the grand jury proceedings and his resulting indictment should be rejected.

---

[20]  Rec. Doc. 14, p. 3

Daubert Claim

Petitioner claims that the trial court erred in allowing the introduction of highly unreliable, unscientific, and invalid evidence.  On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

> Defendant contends that the trial court erred in failing to perform its gate-keeping function under **Daubert v. Merrell Dow Pharmaceuticals, Inc.,** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in that it allowed highly unreliable, unscientific, and invalid evidence to be presented as evidence by the State.
>
> Defendant initially filed a request for a **Daubert** hearing on May 10, 1999.  That hearing took place on January 4, 2000, and written reasons for judgment, along with the judgment, were filed by the trial court on May 25, 2000.  The trial court found that the mitochondrial DNA evidence, although not entirely conclusive, was probative and reliable scientific evidence and thus admissible.
>
> The State subsequently gave notice to defendant of its intent to use additional DNA evidence, specifically the results pertaining to the vaginal swab that were obtained by the FBI from the testing of bodily fluids using PCR-STR (polymerase chain reaction short tandem repeats), multiplex testing technique using the AmpFLSTR Profiler Plus, and the AmpFLSTR Cofiler testing kits developed by Perkin-Elmer ("PE Biosystems") Corporation.
>
> A second **Daubert** hearing was held on March 22-23, 2001.  Two witnesses from the FBI testified for the State:  Dr. Bruce Budowle, recognized by the court as an expert in the field of PCR/STR DNA analysis; and Brendan Shea, a forensic examiner recognized by the court as an expert in the field of forensic serology and DNA analysis.  Dr. Christie Davis, of Lexigen Science in San Francisco, California, testified on behalf of defendant.  She was accepted by the trial court as an expert in the field of microbiology and DNA testing, but not as a forensic DNA analysis expert.  Cross-examination of Dr. Davis revealed that she had conducted medical research prior to 1990 using DNA but had never performed a forensic DNA test.  The trial court denied defendant's motion to quash the DNA evidence in a thirteen page opinion, which also incorporated by reference a memorandum filed by the state on June 1, 2001.  It is this denial by the trial court that defendant now appeals.

Defendant argues that the methodology relied upon by the State's experts is not reliable in that the State's experts relied upon the fourth or fifth round of DNA work. He further argues that the replication techniques used in the DNA testing were unreliable in that the lab kits used did not meet guidelines of the Technical Working Group on DNA Analysis Methods (TWGDAM). He asserts that these products had not been subjected to confirmed developmental testing and publication. He asserts that there is no test data on failure rates for these two lab kits and argues that, without the basic data on these new kits to define accuracy, these are novel and unproven in the scientific sense. He concludes that the State's experts were glossing over the scientific results and substituting patently subjective conclusions contrary to the scientific results.

Dr. Davis testified on behalf of the defendant that, without primer studies, these lab kits are subject to imbalance, mutations, and over-amplification. Defendant contends that the problem, established by Dr. Davis's testimony, is not related to the STR and PCR procedures themselves, but to the specific character of these two test kits, the lack of developmental validation for them and, therefore, a lack of testing, peer review, and publication under **Daubert**.

The decision whether to accept or reject a person as an expert falls to the great discretion of the trial court, whose rulings will not be disturbed absent an abuse of discretion. See La. Code Evid. art. 702. With respect to scientific evidence, the trial judge acts as a gatekeeper, admitting pertinent evidence based on scientifically valid principles, which evidence has application to the facts of the case. The court's evaluation of scientific evidence must be flexible, with an eye toward reliability and relevancy. Relevant factors determining whether scientific evidence is reliable include: (1) the "testability" of scientific theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted in the scientific community. Scientific evidence should be admitted whenever the court's balance of the probative value and the prejudicial effect results in a determination that the evidence is reliable and helpful to the trier of fact. Admission of scientific evidence is within the discretion of the trial judge. **State v. Edwards**, 97-1797, pp. 25-29 (La. 7/2/99), 750 So.2d 893, 908-911, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999).

The relevance of DNA, blood, and saliva testing evidence is set forth in La. R.S. 15:441.1 as follows:

- 14 -

> Evidence of deoxyribonucleic acid profiles, genetic markers of the blood, and secretor status of the saliva offered to establish the identity of the offender of any crime is relevant as proof in conformity with the Louisiana Code of Evidence.

The Louisiana legislature clearly intended this type of evidence to be admissible absent a showing the evidence is unreliable.  Louisiana courts have adopted the reasoning and observations set forth in **Daubert**, which specifically rejected the "general acceptance" test and outlined the means for determining reliability, answering many questions as to proper standards for admissibility of expert scientific testimony.  In **Daubert**, the United States Supreme Court stated that an inference or assertion of scientific knowledge must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation, i.e., "good grounds" based on what is known.  In short, evidentiary reliability will be based on scientific validity.  **Daubert**, 509 U.S. at 590, 113 S.Ct. at 2795.  The trial court must determine whether the expert is proposing to testify to scientific knowledge assisting the trier of fact to understand or determine a fact in issue.  The court must make "a ... preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue .... Many factors will bear on the inquiry ...." **Daubert**, 509 U.S. at 592-593, 113 S.Ct. at 2796.  "General acceptance" can have a bearing on the inquiry.  **Daubert**, 509 U.S. at 594, 113 S.Ct. at 2797.  <u>See also</u> **State v. Quatrevingt**, 93-1644, pp. 10-11 (La. 2/28/96), 670 So.2d 197, 204, <u>cert. denied</u>, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996).

In the instant matter, Dr. Bruce Budowle testified at the **Daubert** hearing that there are numerous validation studies of the type of DNA testing used in the instant case.  These studies, which Dr. Budowle specifically discussed, support the current protocol in use at the F.B.I. lab for STR typing.  An intensive study validating the AmpFLSTR Profiler Plus and the AmpFLSTR Cofiler testing kits by comparison with the Powerplex 16 kit produced by Promega Corporation again validates the testing kits used in the instant matter.  Another study validating the Profiler Plus and Cofiler kits, which was discussed at the **Daubert** hearing, was "Practical Applications of Genotype Surveys and Forensic STR Testing", which Dr. Budowle

- 15 -

co-authored.  He also described other studies that focused on the thirteen loci routinely used for DNA testing in F.B.I. casework.  Dr. Budowle pointed out that the sources he discussed in court were only a small subset of the publications available on forensic STR DNA analysis.  He testified that STR DNA testing techniques are being widely investigated and evaluated and being used by the scientific community at large and beyond just that of forensic science.

Dr. Davis, defendant's expert witness, had previously testified in **People v. Hill**, 107 Cal. Rptr. 2d 210 (Cal. App. 2d Dist. 2001).  The California court noted that Dr. Davis had conducted medical research prior to 1990 using DNA but had never performed a forensic DNA test.  In the **Hill** matter, Dr. Davis admitted that the Profiler Plus kit is used by the California Department of Justice, the F.B.I., and the majority of forensic labs conducting DNA tests.  **Hill**, 107 Cal. Rptr. 2d at 118.  The **Hill** court determined that, notwithstanding Dr. Davis' testimony to the contrary, this test methodology cannot be said to be experimental or of dubious validity.  **Hill**, 107 Cal. Rptr. 2d at 118.

In the instant matter, Dr. Budowle testified that the Profiler Plus and Cofiler testing kits are generally accepted in the scientific community and are in widespread use.  He testified that primer sequences are not absolutely necessary for validation because any lab kit can be tested out to see if it is reliable and producing consistent results.  Thus, meaningful peer review can be conducted without the publication of primer sequences by the Perkin-Elmer Corporation.  Dr. Budowle explained that TWGDAM guidelines on developmental validation studies are not mandatory but are simply guidelines.  They were established as interim guidelines and were replaced in October 1988 by the DNA Advisory Board with quality assurance standards for practicing DNA typing.

The court recognized the deficiencies in Dr. Davis's experience in qualifying her as an expert, but stated that the deficiencies would go to the weight of her testimony.  In light of Dr. Budowle's experience, credentials, and testimony, we find that the trial court fulfilled its role as gatekeeper in ensuring that the DNA evidence to be presented by the State would assist the jury, was reliable, and was founded on generally accepted principles that were subject to publication, testing, and peer review.

Accordingly, we find the trial court did not err in denying defendant's motion to quash the DNA evidence.  This assignment of error is without merit.[21]

As an initial matter, this Court must note the limitations on the scope of its review regarding this claim.  Petitioner essentially invites this Court to examine whether the Louisiana courts correctly applied <u>Daubert</u>.  For the following reasons, that is an invitation which this Court may not accept.

"<u>Daubert</u> is not premised on the [federal] Constitution."  <u>Black v. Thomas</u>, No. 1:04-cv-567, 2006 WL 2547405, at *7 (M.D. Ala. Aug. 31, 2006); <u>see also</u> <u>Williams v. Withrow</u>, 328 F.Supp.2d 735, 745 (E.D. Mich. 2004).  Rather, it has been noted:

> <u>Daubert</u> is an exegesis of Rule 702 of the Federal Rules of Civil Procedure and governs the admission of expert evidence in federal trials only.  <u>Daubert</u> does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution.

<u>Kinder v. Bowersox</u>, 272 F.3d 532, 545 n.9 (8th Cir. 2001); <u>see also</u> <u>Norris v. Schotten</u>, 146 F.3d 314, 335 (6th Cir. 1998).  Accordingly, <u>Daubert</u> has no direct applicability to federal *habeas corpus* claims and cannot serve as a basis for the granting of *habeas* relief.  <u>See</u> <u>Keller v. Larkins</u>, 251 F.3d 408, 419 (3rd Cir. 2001); <u>Payne v. Bobby</u>, No. 2:05-CV-050, 2006 WL 508784, at *23 (S.D. Ohio Feb. 27, 2006), <u>adopted</u>, 2006 WL 2583380 (S.D. Ohio Sept. 6, 2006); <u>Hassinger v. Adams</u>, No. C 05-01011, 2006 WL 294798, at *13 (N.D. Cal. Feb. 7, 2006).

This Court is, of course, aware that the Louisiana Supreme Court has found <u>Daubert</u> persuasive and, *as a matter of state law*, has similarly adopted a "requirement that expert scientific

---

[21] <u>State v. Stogner</u>, No. 2002-KA-1884, at pp. 7-11; State Rec., Vol. XXVII of XXVIII.

testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702." State v. Foret, 628 So.2d 1116, 1123 (La. 1993). The Louisiana Supreme Court continued: "As we find the Daubert court's 'observations' on what will help to determine this threshold level of reliability to be an effective guide, we shall adopt these 'observations', as well." Id. Nevertheless, although Foret dictates that Louisiana courts use the Daubert considerations as a guide in determining admissibility of scientific evidence, those courts are ultimately deciding whether the evidence in a particular case is admissible under article 702 of the *Louisiana* Code of Evidence. Therefore, a state court's decisions on such a matter concerns an issue of *state* law, and such state law determinations simply are not reviewable in a federal *habeas corpus* proceeding. See Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998) ("In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."). Rather, "a state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness." Id. Therefore, *habeas* relief is warranted only where the alleged evidentiary error "played a crucial, critical, and highly significant role in the trial." Id.

In the instant case, both the state district court and the intermediate appellate court gave careful consideration to whether the Profiler Plus and Cofiler test results were admissible. Both courts gave detailed and persuasive written reasons as to why the tests results were in fact admissible. Petitioner has failed to establish that those rulings were erroneous, much less so egregiously erroneous as to render his trial fundamentally unfair. Therefore, petitioner's federal *habeas* claim challenging the admission of that evidence necessarily fails.

Ineffective Assistance of Counsel

In this case, petitioner was appointed *two* attorneys to represent him.  He now claims that both of those attorneys were ineffective.[22]  When these claims were asserted in his state post-conviction proceedings, the state district court judge rejected the claims, noting that "[d]efense counsel did an outstanding job defending this applicant ...."[23]  For the following reasons, this Court likewise finds the claims to be without merit.

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  See id. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ...

---

[22]  Presented as two separate claims by petitioner, the claims will be discussed together for ease of analysis.

[23]  State Rec., Vol. XXVII of XXVIII, Order dated April 19, 2004.  The Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court denied petitioner's related writ applications without assigning reasons.  State ex rel. Stogner v. State, No. 2004-KW-1144 (La. App. 1st Cir. Sept. 7, 2004) (unpublished); State ex rel. Stogner v. State, 904 So.2d 736 (La. 2005) (No. 2004-KH-2560); State Rec., Vol. XXVII of XXVIII.

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim. Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. Strickland, 466 U.S. at 697.

A claim of ineffective assistance of counsel is a mixed question of law and fact. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Therefore, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Petitioner first argues that his counsel were ineffective in failing to object to certain physical evidence as not being properly authenticated.  The Louisiana Code of Evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  La. Code Evid. art. 901(A).

Specifically, petitioner points to State's Exhibits 62 and 63, which were blood swatches used as part of the DNA analysis.  When the prosecutor moved to have those exhibits admitted into evidence, defense counsel objected, stating:  "Your Honor, we would just interpose an objection at this time until they're properly chained."[24]  The trial judge ruled:  "I think they can come in at this point."[25]

Much later in the trial, after the prosecution rested its case, defense counsel raised for the first time the issue regarding lack of authentication:

BY MR. ALFORD [defense counsel]:

... Give me Exhibit 62 and 63.  Your Honor, I want to direct the Court's attention to Article 901 of the Louisiana Code of Evidence and suggest to this Court that there exists an error in this record that prevents the defendant from being convicted under any circumstances of the crime charged.  And that the error exists – may I see them please.

---

[24]  State Rec., Vol. XXI of XXVIII, transcript of October 10, 2001, p. 94.

[25]  State Rec., Vol. XXI of XXVIII, transcript of October 10, 2001, p. 94-95.

The error that exists in this record is that State's Exhibits Number 62 and Number 63 have never been authenticated as required by Article 901.  And that everything that we have heard in this court concerning DNA evidence is based upon these two exhibits.

They have never been identified.  The source of them has never been testified to.  No witness has appeared to say, I made these.  They have, in no way, been authenticated indicated [sic].  And 901 requires that they be authenticated.

The Court has ruled them admissible, but they have not been authenticated.[26]

Defense counsel noted that he believed he had sufficiently objected to the evidence as unauthenticated at the time it was admitted:

BY MR. ALFORD:
... We want to make it clear on this record, Your Honor, that we objected to the admissibility of those two.  And the Court overruled our objection.

We objected in terms of the chain had not been shown as to 62 and 63.  That is our way of saying that they had not been authenticated.  It was not chained.  Not authenticated as required by the 901, or identified as required by 901.[27]

The trial judge then ruled that the issue would be considered the following morning.  When the trial resumed the next day, defense counsel again contended that the authentication issue had been properly raised, a contention the prosecution disputed:

BY MR. McNARY [defense counsel]:
Exhibits 62 and 63 was couched in terms of the, they had not properly chained the evidence.  There is no article dealing with chaining of the evidence.  In fact, that is all part and parcel of Article 901, dealing with authentication; that an object is, in fact, what it is purported to be.

---

[26]  State Rec., Vol. XXIV of XXVIII, transcript of October 16, 2001, p. 168.

[27]  State Rec., Vol. XXIV of XXVIII, transcript of October 16, 2001, p. 169-70.

And I want to make clear for the record, that was the nature of the objection, the authentication.

BY MR. GARDNER [the prosecutor]:
          And I wanted to preserve a couple of issues.  At the time – I agree with Kevin that at the time that 62 and 63 were offered, there was, whatever objections were made were made on the basis of chain of custody.  And I was familiar with the lengthy series of chain of custody cases which indicated it goes to the weight rather than the admissibility.
          At the conclusion of the trial, in my opinion, and again it's only my opinion, that objection was raised under 901, which was, at that time, untimely.  It had not been raised at the time of the introduction and was not addressed at that time because of that.  I would just preserve that opinion of mine of the sequence of events.[28]

Petitioner argues that counsel were ineffective in failing to specifically object to the evidence as not properly authenticated.  This Court accepts the contention that a "chain of custody" objection is not the equivalent of a "lack of authentication" objection, in that the issues, although at times overlapping and interrelated, are distinct.  See La. Code Evid. art. 901, Comment (d).  The Court further accepts the contention that the exhibits at issue, i.e. the blood swatches used in the DNA analysis, were crucial evidence in the instant case. Nevertheless, for the following reasons, the Court finds that petitioner is not entitled to relief with respect to this claim.

Petitioner's challenge to Exhibits 62 and 63 is not truly one of authentication.  The swatches were identified and authenticated by Robert Fram in the following exchange from the transcript:

EXAMINATION BY MR. GARDNER:

---

[28]  State Rec., Vol. XXIV of XXVIII, transcript of October 17, 2001, pp. 6-7.

> Q.    I will show you State's Exhibit No. 62 and 63 and ask if you recognize these items, and if so, how?
>
> A.    Yes, I do.  They have the lab markings and initials on them.
>
> Q.    Are those, in fact, what were identified to you as the known samples from which you turned over to Dr. Stewart for generating a known genetic profile for both the defendant as well as Lauren Easterling?
>
> A.    Yes, they are.[29]

Therefore, the swatches were identified and authenticated as the swatches represented to Fram as containing the blood of petitioner and the victim, which he then turned over to another expert as part of the DNA testing.

Petitioner does not in reality dispute that fact.  Rather, petitioner's true challenge to Exhibits 62 and 63 is that there was no evidence that the representation made to Fram, i.e. that the blood samples on the swatches were from petitioner and the victim, was in fact true, because the person who prepared the swatches did not testify.  That defect, however, does not mean that the *swatches* were not identified and authentic.  Rather, the point petitioner is attempting to make is that the blood samples which were used in the DNA tests were never actually linked to petitioner and the victim.  While that purported defect may raise an issue of the *relevance* of the swatches and, by extension, the DNA tests, there is no real issue that the exhibits were in fact the authentic swatches used in the DNA tests.

It is also true that counsel did not object to the exhibits on the basis of relevance. However, this Court cannot say that they performed deficiently in failing to make that objection.

---

[29]  State Rec., Vol. XXI of XXVIII, transcript of October 10, 2001, p. 90.

If they had made such an objection, the prosecution, which was still in the midst of presenting its

case, may well have been able to produce evidence as to who made the swatches and how they were

prepared.  Rather than give the prosecution that golden opportunity to cure the purported defect in

its case, defense counsel may well have made the strategic choice to avoid that possibility and then,

once it was too late for the prosecution to cure the defect, argue that the prosecution presented no

evidence on a critical issue, thereby failing to establish petitioner's guilt beyond a reasonable

doubt.[30]  In fact, defense counsel made just that argument in his summation:

> If ever I have seen a case of reaching in my life, it's these two
> exhibits, State's Exhibit 62 and State's Exhibit 63.  Who created
> these exhibits?  I want you to think back in your mind.  Who created
> the spot of blood, the big spot of blood on a piece of cloth?  Who did
> that?  What testimony have you heard?  Yes, I took blood from here,
> blah, blah, blah, put it on this cloth.  Think about that a minute.  We
> are going to come back to that.[31]

He later continued:

> And I know what you are saying to me, now, what you are
> questioning in your mind.  Well, I want you to tell me how smart –
> I won't use the word.  How do you get around the DNA?  Folks, you
> should never have even heard the DNA testimony.  It's an error in

---

[30]  Strategic decisions normally do not warrant *habeas* relief.  As the United States Fifth Circuit
Court of Appeals has noted:

> We will not find inadequate representation merely because, with the benefit of
> hindsight, we disagree with counsel's strategic choices.  A conscious and informed
> decision on trial tactics and strategy cannot be the basis for constitutionally
> ineffective assistance of counsel unless it is so ill chosen that it permeates the entire
> trial with obvious unfairness.

Green v. Johnson, 116 F.3d 1115, 1122 (5th Cir. 1997) (citations and quotation marks omitted).

[31]  State Rec., Vol. XXIV of XXVIII, transcript of October 17, 2001, at p. 45.

this record.  Why should you have heard the DNA testimony?  It's very, very clear.  And you have got to ask yourself and debate with yourself and you couldn't produce the answer to the question I'm about to ask you.

We do know, and I'm back to 62 and 63.  We do know, because we can tell from testimony and from marking them, from testimony and marking them, we can tell that at least at one time, 62 – 62 was in the possession of the New Orleans Police Department Crime Lab, criminalistics, Joe Tafaro.  He did not testify.

We do not know if he made this slide, this known sample. We don't know who made this known sample.  We do not know if it's Ralph Stogner's blood on this known sample.  Tell me, what witness said this is Ralph Stogner's blood on this swatch?  What witness told you that?

Likewise, on 63, a swatch we know went through the FBI laboratory and that we know, because there's a little label here, that it went, it says, Orleans Parish Coroner's Office on here.  And it says New Orleans Crime Lab, and it says criminalist.  Who?  Joseph Tafaro.  But it doesn't say who made the swatch.  This is of Lorin's blood.  It doesn't say where it came from.  Who testified where this swatch came from?  And let's go over that a minute.

Dr. McGarry, and it's important that you remember this, Dr. McGarry said, testified that he took a vial of blood from Lorin's body.  A vial of blood.  He never testified that he made a swatch of anything.  Never testified to that.

Dr. Muller was called.  He testified, after being qualified as an expert, that he took two vials of blood from Ralph Stogner in the St. Bernard jail.  He doesn't testify that he made this swatch. Because he didn't.  And Dr. McGarry didn't make this swatch, either. I can only say that because they didn't say they did, neither one of them said it.  And no other person has told you that they made these swatches.  No person.  You are to assume.

....

Now, if you don't know who made these swatches, you do know something else.  You know that the FBI used them for the purpose of all their DNA testimony.  The FBI was asked, Did you make these swatches?  We didn't make those swatches.  They came into us.  Well, how did they get made?  Who made them?  What's on them?

Say there's blood on them.  I have no reason to doubt that. Whose blood?  Your blood?  His blood?  Whose blood is on these swatches that they say match the Q-Tip? If you can answer that, with

> any certainty, I'm wrong.  Not only can you not answer that question,
> the reason you can't answer it is it wasn't presented to you.[32]

This Court cannot say that counsel performed deficiently in electing that tactic rather than objecting to the evidence at a point when the prosecution could still have corrected the purported defect.

Moreover, even if the Court were to find that counsel's performance was deficient in not making such an objection, it is further noted that petitioner has not shown that prejudice resulted.  If such an objection had been made, there is no reason to believe that the prosecution, which was still presenting its case in chief, would not have been afforded the opportunity to cure the defect.  Further, petitioner has presented no evidence that the blood on the swabs was not in fact his blood and that of the victim, or that the prosecution could not have established that fact in response to such an objection.  Accordingly, he has not met his burden to show that there is a reasonable probability that the result of the proceeding would have been different if counsel had made the objection.

Accordingly, for all the foregoing reasons, the Court finds that petitioner has failed to meet his burden of proof to establish that his counsel were ineffective in failing to lodge additional objections to State's Exhibits 62 and 63.[33]

Petitioner next argues that his counsel were ineffective in "failing to recognize" that evidence used against petitioner at trial was seized after he had withdrawn his voluntary consent to

---

[32]   State Rec., Vol. XXIV of XXVIII, transcript of October 17, 2001, at pp. 51-54.

[33]   At times in his rambling federal application, petitioner also discusses other physical evidence presented at trial.  It is unclear to what extent, if any, petitioner is making this same claim regarding that other evidence.  However, to the extent that he is similarly challenging the other evidence, the same analysis would apply and any such claims should be rejected for the same reason.

the search and before he was *presented with* a search warrant.[34]  Obviously, this ineffective assistance claim can have no merit unless petitioner is correct in his underlying premise, i.e. that officers had no authority to seize evidence at the time the seizure took place.  For the following reasons, the Court finds that petitioner has failed to demonstrate that the underlying premise is correct either as a matter of law or fact.

Petitioner's underlying premise is that, as a matter of law, a search may be conducted pursuant to a warrant only after the warrant has been *presented to* the property owner.  That clearly is not the case under the federal Constitution.  United States v. Grubbs, 126 S.Ct. 1494, 1501 (2006) (the Fourth Amendment imposes no requirement that the executing officer present the property owner with a copy of the warrant before conducting the search).  Moreover, petitioner cites no authority, and this Court has found none, to establish that Louisiana law is to the contrary.  Further, in the instant case, the evidence showed that the search warrant had *already been issued* at the time petitioner revoked his consent.[35]  Accordingly, even if the search and seizure continued *after* the consent was revoked, the evidence was still properly obtained because the search warrant had already been issued.

---

[34] This Court notes that the United States Supreme Court has held: "In Kimmelman [v. Morrison, 477 U.S. 365, 374 (1986)], the Court held that although certain Fourth Amendment violations are themselves not cognizable on federal habeas review, see Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), counsel's failure to litigate such Fourth Amendment claims competently may still give rise to a cognizable ineffective-assistance claim."  Lockhart v. Fretwell, 506 U.S. 364, 380 (1993).

[35] See, e.g., State Rec., Vol. III of XXVIII, transcript of July 8, 1999, p. 25

In any event, regardless of when the search warrant was issued and/or presented to him, petitioner has not established that the disputed evidence was in fact seized *after* he withdrew consent as he now alleges.  Rather, to support his claim, petitioner has scoured the transcripts of the various hearings in this matter to find arguable inconsistencies in the testimony of a few witnesses regarding when the seizure of the evidence occurred.  Petitioner posits that when the various bits of testimony are pieced together, it becomes apparent that the seizure actually took place after he had withdrawn his voluntary consent to the search.  However, even if the Court overlooks the fact that several of the witnesses in question were only estimating when certain events occurred, as well as the fact that the testimony was remote in time from the actual events, the Court cannot overlook the fact that the witnesses in question *were not present* when the seizure occurred.  Moreover, when the Court examines the testimony of a person who *was present*, it is evident that the seizure did not take place as petitioner suggests:  FBI Special Agent Denaldo Rodriguez clearly testified that the seizure of evidence stopped once petitioner withdrew his consent,[36] and that the evidence in question here was seized *before* consent was withdrawn.[37]

Therefore, for all of the foregoing reasons, the Court finds that petitioner has not established that the evidence in question was seized at a time when the officers were without authority to conduct the search and seizure operation.  Accordingly, his related claim that counsel

---

[36]  The search was stopped because members of the search team were unaware that the search warrant had in fact already been issued.

[37]  State Rec., Vol. IV of XXVIII, transcript of October 5, 1999, at pp. 47 and 72-73.

was ineffective in failing to argue that the evidence was improperly seized on that basis necessarily fails.

This Court finds that petitioner has failed to demonstrate that the state court's decision denying either of his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court likewise rejects those claims.

### Brady Claims

Petitioner next argues that the prosecution withheld exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  When those claims were asserted in his state post-conviction proceedings, the state district court judge rejected the claims on the merits.[38]  For the following reasons, this Court likewise finds the claims to be without merit.

Regarding Brady claims, the United States Fifth Circuit Court of Appeals has stated:

> Brady requires the state to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.
> Under Brady, to establish that the state has breached this duty, the defendant must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment.  This duty extends to both exculpatory and impeachment evidence.

---

[38]  State Rec., Vol. XXVII of XXVIII, Order dated April 19, 2004.  The Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court denied petitioner's related writ applications without assigning reasons.  State ex rel. Stogner v. State, No. 2004-KW-1144 (La. App. 1st Cir. Sept. 7, 2004) (unpublished); State ex rel. Stogner v. State, 904 So.2d 736 (La. 2005) (No. 2004-KH-2560); State Rec., Vol. XXVII of XXVIII.

DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002) (internal quotation marks and citations omitted).  "Whether documents must be produced and whether they are material under Brady is a mixed question of law and fact."  Trevino v. Johnson, 168 F.3d 173, 184 (5th Cir. 1999).  Therefore, this Court is required to defer to the state court's decision rejecting petitioner's Brady claim unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Petitioner first argues that the prosecution withheld information regarding the twelve hairs of the victim admitted into evidence.  At trial, FBI Special Agent Robert Fram testified that he concluded that four of the twelve hairs were "forcibly removed" due to the pigment and shape of the roots of those hairs.  Fram had not included that information in his report.  However, once that information came to light, defense counsel was allowed to fully cross-examine Fram on that issue.[39]

Even if petitioner could surmount the other problems with respect to this claim,[40] there is one he clearly cannot overcome.  The information in question came to light during trial and defense counsel had the opportunity to put it to effective use if he indeed believed it to be exculpatory.  Accordingly, it was not "suppressed" in violation of Brady and its progeny.  See, e.g.,

---

[39] State Rec., Vol. XXI of XXVIII, transcript of October 10, 2001, pp. 65-71.

[40] It has not been established that the prosecution knew or should have known of this information prior to trial.  Moreover, it is not clear how this information is "exculpatory."  Petitioner seems to argue that the fact that hairs were forcibly removed somehow leads to the conclusion that the hairs were planted by police.  That conclusion is, to say the least, a stretch.  Rather than evidence of tampering, the fact that some hairs were forcibly removed would seem to be more indicative of the use of violence, such as obviously occurred in this case where an eleven-year-old child was vaginally and anally raped, beaten, and murdered.

Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994); United States v. McKinney, 758 F.2d 1036, 1049-50 (5th Cir. 1985).

Petitioner's next claim is that the prosecution knew or should have known that Joseph Tafaro, an officer involved in the investigation, had been convicted of perjury and evidence tampering in connection with the prior, unrelated murder prosecution of Ricky Coston. That claim also fails for several reasons.

First, petitioner has presented no evidence that Tafaro has ever been convicted of such crimes.

Second, petitioner has not even produced any convincing evidence that Tafaro was ever proven to have engaged in misconduct with respect to Coston's prosecution. Rather, petitioner points only to two pieces of "evidence" attached to his petition. The first piece of evidence is a partial docket sheet and a consent judgment from a federal civil rights action Coston filed in this Court against Tafaro and others. However, because that case was settled and a consent judgment was entered,[41] there was no judicial finding in that case that Tafaro actually engaged in any wrongdoing. The second piece of evidence is an unsigned letter attorney Kern Reese allegedly sent to Chief Richard Pennington on January 5, 1999, regarding an unrelated prosecution. In that letter, allegations of misconduct are made against various officers, including Tafaro. However, those unsubstantiated allegations of misconduct are not evidence that Tafaro was ever in fact found to have engaged in misconduct.

---

[41] Coston v. Tafaro, Civ. Action No. 99-3709 "C" (E.D. La. Apr. 16, 2001).

Third, even if there was any evidence available regarding misconduct or alleged misconduct of Tafaro in the past, petitioner does not offer any evidence, such as an affidavit from trial counsel, that the evidence was in fact withheld in this case.  Such an omission of any evidence on the initial prong of the <u>Brady</u> inquiry is, in and of itself, fatal.  <u>See</u> <u>Harris v. United States</u>, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him].), <u>aff'd</u>, 216 F.3d 1072 (2nd Cir. 2000); <u>see also</u> <u>United States v. Avellino</u>, 136 F.3d 249, 261 (2nd Cir. 1998); <u>Cruz v. Artuz</u>, 97-CV-2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002).[42]

---

[42] The Court notes that petitioner additionally opines that, "[i]n all fairness," the prosecution should have called Tafaro as a witness in this case to testify regarding the physical evidence.  That allegation is not a <u>Brady</u> claim.  Moreover, to the extent that petitioner is asserting the allegation as a distinct claim, it is clearly meritless.  The Constitution did not require that the prosecution call Tafaro.

To the extent that petitioner also suggests that his counsel were ineffective in failing to call Tafaro to testify, that suggestion is clearly meritless.  "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." <u>Evans v. Cockrell</u>, 285 F.3d 370, 377 (5th Cir. 2002) (citing <u>Sayre v. Anderson</u>, 238 F.3d 631, 635-36 (5th Cir. 2001)).  To show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" <u>Evans</u>, 285 F.3d at 377 (quoting <u>Alexander v. McCotter</u>, 775 F.2d 595, 602 (5th Cir. 1985)).  In the instant case, petitioner has produced no evidence which indicates that Tafaro would have testified in a manner beneficial to defense.  Rather, as defense counsel obviously recognized, Tafaro's testimony would have benefitted the prosecution by supplying evidence to fill perceived gaps in the prosecution's case regarding the authentication of evidence and the chain of custody of that evidence.  Although petitioner suggests that Tafaro's testimony would have been favorable because his past misdeeds in other cases would have come to light, the Court again notes that petitioner has not established that such misdeeds occurred.

For the foregoing reasons, this Court finds that petitioner has failed to demonstrate that the state court's decision denying his <u>Brady</u> claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court likewise rejects those claims.

## **<u>RECOMMENDATION</u>**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Ralph R. Stogner, III, be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-first day of February, 2007.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

- 34 -